1

1          UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT

2
   STEPHEN BERNSTEIN              :
3  AND PHYLLIS BERNSTEIN         : NO.: 3:02 CV 1740(JCH)
                                  :
4  V.                            :
                                  :
5  TOWN OF SHERMAN               : MARCH 30, 2004

6
                DEPOSITION OF JOHN SERTH

7

8  A P P E A R A N C E S:

9       KOSKOFF, KOSKOFF & BIEDER
            Attorneys for the Plaintiff
10          350 Fairfield Avenue
            Bridgeport, Connecticut 06604
11          Telephone:  (203) 336-4421
            Facsimile:  (203) 368-3244
12     BY:  RICHARD BIEDER, ESQ.

13      HOWD & LUDOFF
            Attorneys for the Defendant,
14          Town of Sherman
            65 Wethersfield Avenue
15          Hartford, Connecticut 06114
            Telephone:  (860) 249-1361
16          Facsimile:  (860) 249-7665
       BY:  THOMAS R. GERARDE, ESQ.

17
   (APPEARANCES CONTINUED)

18
                    REPORTED BY:
19

20              ROBERT MILLER
        LICENSED SHORTHAND REPORTER
21           LICENSE NO. 10

22      NIZIANKIEWICZ & MILLER
            REPORTING SERVICES
23          972 Tolland Street
       East Hartford, Connecticut 06108
24          Telephone (860) 291-9191

25


        NIZIANKIEWICZ & MILLER REPORTING SERVICE

EXHIBIT 2

1    connection with your assignment, sir?

2         A    The most important thing was directions to

3    the accident location.  Then I was provided with

4    photographs and provided with the different

5    depositions.  Provided with the five- or six-year plan

6    that the town had for improving -- maintaining roads

7    in the town.  And I was also provided with a log of

8    things that had been done by the town highway

9    department.

10        Q    I assume you have those materials with you

11   today?

12        A    Yes.

13        Q    Now, did you obtain any materials on your

14   own, apart from things that were provided to you?

15        A    No.

16             MR. BIEDER:    I don't know what you

17             mean by obtain materials on his own.

18             THE WITNESS:    I went out,

19   took photographs, if that is what you are talking

20   about.

21   BY MR. GERARDE:

22        Q    You went?

23        A    Somebody asked.  I went out and took

24   photographs.  That is what I thought you meant by the

25   question.

1          A    I use the fence as an example.

2          Q    Did you document the location of that jog

3    in the fence that we see in some of the pictures?

4          A    If I did the measurements, I believe I did.

5    Because that would be something that would show up

6    nice on a plot.

7          Q    As a reference point?

8          A    Yes.

9          Q    You have a copy of your C.V.  I want to ask

10    you a few questions about it.

11               It appears you have been consulting, either

12    exclusively or as a part-time practice since 1981; is

13    that right?

14          A    Yes.

15          Q    I want to talk to you about the jobs you

16    had before you became a full-time consultant.  Because

17    I assume you're a full-time consultant now?

18          A    Yes.

19          Q    Since -- for how long have you been a

20    full-time consultant?

21          A    Since June of '92.

22          Q    Talk to me about the jobs you had from May

23    of '79 to June of '92.

24          A    In May of '79, I worked for the New York

25    State Department of Transportation, Region One, which

1   is the Albany area.  I was an engineering aid on a

2   surveying crew.  They let me look through the

3   instrument a little bit.  Mostly it was holding the

4   survey rod.  If somebody had to go in the swamp, it

5   was me.

6            After that I was a construction inspector

7   in Glen Falls, New York.  North of Albany.

8   Basically -- this was reconstruction of an

9   intersection.  They have state employees out there to

10  watch and make sure the people of the state of New

11  York are getting what they paid for.  I was at

12  college.  A year in graduate school there.  I worked

13  for the State University of New York at Buffalo, civil

14  engineering department, as a teaching aide for their

15  transportation courses.  And I also worked as a

16  research assistant for their cold mix asphalt

17  laboratory.

18            Also, while I was in college, I was --

19  during the summers when I wasn't working for the state

20  I had started doing surveys for Champagne Associates

21  and for my father for accident reconstruction type

22  things.

23       Q    Your father was in the business?

24       A    Yes.

25       Q    Is your father alive?

1    A    Yes.

2    Q    What's his name?

3    A    John Serth, Senior.

4    Q    You worked with Joe Champagne?

5    A    Basically, I did surveys for his office.  I

6    was not a full-time employee.  While I was in college

7    I did a few surveys for him on some of these projects.

8    Q    Tell me what your father's business is, if

9    he's still in practice?

10    A    He has one remaining case.

11    Q    He is an engineer also?

12    A    Yes.

13    Q    Did he practice under a certain name?

14    A    John Serth, PE.  For a while, I think it

15    was John E. Serth, PEC.

16    Q    He consulted with attorneys and other

17    persons?

18    A    Yes.

19    Q    In the same way you are consulting with the

20    Koskoff, Koskoff & Bieder group?

21    A    Yes.

22    Q    Did you ever work with him on any of his

23    cases?

24    A    We never were like partners or anything

25    like that.  But sometimes when he needed work done he

1   would use me for that stuff.  And I have used him for

2   surveys with me, I believe.

3       Q   Where is his operation base?

4       A   Also in Clifton Park, but on Western Drive.

5   We both had libraries and we use each other's

6   libraries.

7       Q   Have you spoken with him at all about this

8   assignment that you're under?

9       A   No.  Dad's got a motor home and a tan.  He

10  doesn't want to hear about these things.

11               MR. BIEDER:  Neither do Mr. Clifford

12          or I.

13  BY MR. GERARDE:

14      Q   What about New York State DOT, Project

15  Development Bureau?

16      A   Okay.  Continuing on.  After -- I got out

17  after my master's degree.  I spent a little over a

18  year in the Project Development Bureau.  Basically, we

19  would be looking at existing highways in large part,

20  although there were smaller ones.  Deciding what the

21  answer was; if the project should be progressed, the

22  pavement maintained another project be progressed, or

23  it was time to look at building a new interchange,

24  those type of things.  They were future projects,

25  making engineering decisions on how to best spend the

1    money.

2              After a year and half, so in there, I spent

3    eight years in the New York DOT design bureau.  After

4    these things, after college, in the main office in

5    Albany.  In the design bureau I designed projects.

6    The guy that actually puts the pen to the paper; or

7    nowadays, clicks the mouse, makes it happen.

8              After that, I passed the test on the first

9    try, got my engineering license, was promoted to the

10   Consultant Management Bureau.  Basically, they have

11   engineers that hopefully have experience on how to

12   design and then the guy who does larger projects.

13             There is not enough guys to do projects.  I

14   left there and decided it was time to do consulting

15   work.

16        Q    Did you have a maintenance function in any

17   of these positions with the DOT?

18                  MR. BIEDER:  Object to the term

19                  "maintenance function."  I don't

20                  know what it means.

21   BY MR. GERARDE:

22        Q    In other words, were you either actively

23   involved in the maintaining or supervision of others

24   who were maintaining highways during any of these

25   jobs?

1        A      They don't hand the keys to the truck to

2    the engineers.  But as far as this pavement can be

3    maintained or this pavement needs to be rubberized, we

4    are going to resurface it, I would be working with the

5    people making the decision.  It would be an interface

6    with the department making these decisions.

7              If you are asking if I drove the snowplow,

8    no.

9        Q      Let's go to the paving and patching

10   functions.  You obviously weren't responsible for

11   paving and patching yourself?

12       A      Right.

13       Q      Did you supervise the crews that paved and

14   patched?

15       A      No.

16       Q      Did you ever become a decision maker in any

17   capacity as to what would be paved, what would be

18   patched?

19       A      In the Project Development Bureau, we would

20   be looking at the pavement and working with the

21   pavement management team to see if this was pavement

22   that could be overlaid and last for another couple of

23   years and the projects could be slid back.  It was

24   engineering decision-making.  Overall big picture.  It

25   wasn't, does this hundred feet get an overlay.

1      Q    And was the pavement management team within

2    the New York State Department of Transportation?

3      A    They are in the main office.  There is a

4    group that writes the pavement maintenance manual.

5    You would have these around.  They would show the

6    different types of distress -- the same stuff we

7    learned in pavement management in college.  And look

8    at it, say this is alligator cracking; we have a

9    sub-base cracking or sub-base problem; we will

10   continue on with maintenance or it's time to start

11   over from the base of the road.

12          When there is a crack in the road everybody

13   wants it fixed.  Somebody has to be interfaced before

14   the crowd that says we want it fixed, so it is nice on

15   the road.  And the real decision-making, yes, we've

16   got roads to fix.  This one, if we work on the

17   drainage or maintain it better -- well, put overlay

18   down, it would last for another ten years.

19     Q    What's the difference between alligator

20   cracking and reflective cracking?

21     A    Reflective pavements, a lot of pavements,

22   certainly old pavements in New York is called rigid

23   pavements, which is the concrete slabs.

24          With them, you leave them out long enough

25   you start getting new grooves where the tires, they

1   get slippery.  We put a wearing coat over them.  It is

2   black stuff, whether it is stone and oil or real

3   pavement mixture.

4         So, we got the flexible pavement on top of

5   there.  The concrete is still going to move at the

6   joints.  You will get every 40 or 60 feet -- whatever

7   they were paving that year, you will get a reflection

8   up through the flexible pavement, there would be a

9   crack.

10         If you are going down an old country road,

11   they look like blacktop, but there is a crack every 50

12   or 70 or whatever feet they are doing.  There is a

13   concrete slab underneath there.  Those are reflective

14   cracks.

15         Alligator cracks are associated with poor

16   drainage or it looks like alligator skin with cracks

17   running over that.  With that, the base is not strong

18   enough to have what is running over it.  Everything is

19   mushed around, you get an alligator-type crack.

20         Q   What is indicated in terms of maintenance?

21   Do you dig it up, start over or what?

22         A   You got to look at the road and look at

23   what can be done.  If you got the alligator crack, it

24   is an indication that the road is not draining.

25   You've got a problem with water in the road or under

1  the road.

2          The first thing to do is to consider the

3  possibility of maintenance.  If the maintenance has

4  not been up to par, can you improve the drainage so

5  the water will run, won't be getting into the pavement

6  and sub-base.

7          If it is a road with a lot of trucks in the

8  area, that means you are going to have to start

9  digging up and putting drain underneath the road, if

10  you have done everything else.  The first thing would

11  be to get the water off the pavement, see if it dries

12  out, see if it becomes a solid base.

13          Q    Without any patching?

14          A    You got to patch.  If you left the water

15  long enough, it's got to alligator crack.  You have to

16  do the patching to get rid of the alligator cracking.

17  If you don't do the patching, don't take care of the

18  water problem, you are not going to fix your problem.

19          Q    And it would be cracked in short order?

20          A    Yes.  Especially if you put a cold mix out

21  there.  Then asphalt on there.  You would wind up with

22  gravel.

23          Q    Why is it that potholes show up in the same

24  spot all the time, no matter how many times you patch?

25                    MR. BIEDER:  You're assuming that.

54

1    BY MR. GERARDE:

2         Q    It is an intellectual question.

3              Do you have an answer to that?

4         A    Sometimes they will show up --

5                   MR. BIEDER:  I object to the

6              question.

7                   THE WITNESS:  It will show up

8    randomly because something happened to the pavement in

9    that location.  If it is showing up over and over

10   again at one spot, you've got two problems.  First,

11   whatever caused the first pothole -- the water --

12   however, what caused the first pothole is coming back.

13             Second problem, you're patching with a cold

14   mix asphalt.  You got water, you got cold mix.  You

15   got water, it is going to fall apart

16   BY MR. GERARDE:

17        Q    The first time cars drive over it, it falls

18   apart?

19        A    Not the first time.  Rain hits the

20   pavement, run off, even the dirt -- before pavement

21   was designed on the highways, it's not a problem.  It

22   is the mush underneath, along with putting an inferior

23   material down for the patch.

24        Q    So, in terms of you having some

25   responsibility for making a decision about paving and

1   patching versus rumblizing the road and starting over,

2   you would make global decisions, certain decisions

3   about certain stretches of highways, is that correct?

4               MR. BIEDER:  Objection.

5               THE WITNESS:  It would be a

6   decision over a stretch of highway, not just fill that

7   pothole.  It would be more of the five-year program

8   type thought.

9   BY MR. GERARDE:

10      Q    And let me ask you about your private

11  practice.  Do you have a feeling as to -- well, I want

12  to understand what was your private practice, your

13  consulting practice from 1981 to 1992, while you were

14  still working at the other jobs.  And then I will ask

15  you what it has been --

16              MR. BIEDER:  What do you mean, what

17              was?

18              MR. GERARDE:  What did it consist

19  of.

20  BY MR. GERARDE:

21      Q    How many hours were you devoting to private

22  practice, assuming you had a full-time job?

23      A    I had a full-time job.  There would be

24  three-five cases in a year.  I would be out looking at

25  small cases.

1        Q    All right.  And tell me about 1992 forward.

2    You were full-time in private practice since that

3    time?

4        A    Pretty much.  For some of those years I

5    have been teaching over at Union College.

6                    MR. BIEDER:  Union College?

7                    THE WITNESS:  Yes.   In

8    Schenectady, New York.

9            But for the most part it has been answering

10   engineering questions for attorneys, governments,

11   insurance companies, towns

12   BY MR. GERARDE:

13       Q    Do you have a feeling for how many times

14   you have been retained as a consultant for any type of

15   case?

16                    MR. BIEDER:  Since 1992?

17                    MR. GERARDE:  Since 1992.

18                    THE WITNESS:  The last couple of

19   years, the last five years or so, I have been about

20   100 times a year.  Before that, it trialed down.  '92,

21   I would say, there was probably 15 cases maybe.  I

22   don't know the exact number.

23            That gives you an idea.  It picked up from

24   '92.  It is leveled off at one hundred cases a year.

25   I tell attorneys I can't take anymore.

                 NIZIANKIEWICZ & MILLER REPORTING SERVICE

1    BY MR. GERARDE:

2        Q    That was my question.  Do you feel as

3    though you are at full capacity now?

4        A    Pretty much.

5        Q    Do you have any plans to add a partner or

6    associate?

7        A    There is a nice lady that comes up three or

8    four days a week, keeps the office running.  That is

9    enough.  I have seen what happened to Joe Champagne.

10       Q    Do you have a feeling for how many of your

11   assignments, from 1992 forward, by percentage were

12   assignments for lawyers in litigated cases such as the

13   one we are in now versus some other type of

14   consulting?

15       A    It's been almost entirely lawyers in

16   litigated cases or civil cases.

17       Q    Do you have a feeling by way of percentage

18   as to how many of your cases were for the person

19   bringing the suit or the plaintiff versus the

20   defendant?

21               MR. BIEDER:  The person that was

22           injured or killed, you mean, as

23           opposed to the defendant?

24               MR. GERARDE:  Bringing the

25           suit.

1              MR. BIEDER:   There is

2         subrogation suits.   What is it?

3              MR. GERARDE:   That's fair.

4              MR. BIEDER:   Plaintiff

5         victims as opposed to defendants.

6              MR. GERARDE:   Defendant, bad

7         guys.

8              MR. BIEDER:   I didn't say

9         that.   I want to distinguish.

10   BY MR. GERARDE:

11        Q    The party bringing the action or injured as

12   a result of an event.   How many as opposed to the

13   person --

14        A    Here we go.   Try to get this over with.

15             I am thinking we are probably talking maybe

16   60 percent are plaintiffs.   Maybe 35 to 40 percent --

17   the other way around.   The insurance companies, the

18   defendants are the 60 percent or so.   And I never

19   stopped to figure out the exact number.

20             Thirty-five to forty percent are the people

21   that are suing.   Some of these subrogation things, I

22   don't know.   And there are some criminal ones in

23   there.

24        Q    Criminal?

25        A    Both for the prosecution and defense.

1        Q    Give me an example of a typical criminal
2    assignment you handle.

3        A    They have all been different.  I don't
4    think there was a whole lot of typical ones.  There
5    was a county that wanted an accident investigation
6    because there was an intoxicated driver.  I got the
7    feeling they just wanted to make an example of him.
8    The guy was totally wrong.  They wanted to make sure
9    his lawyer wasn't going to plea bargain anything.

10            As far as the defense, they have gone all
11    the way up to death penalty cases.

12        Q    What was your role?

13        A    The original stupid event, the crash.  And
14    they wanted an investigation.

15        Q    In regard to plaintiffs and defense, how
16    many of your assignments, best estimate, involved auto
17    accident reconstruction?

18        A    Ninety eight.

19        Q    Ninety-eight percent?

20        A    Ninety-five, ninety-eight.  There is a few
21    others in there.  Tractor trailers.

22            That is what you intended?

23        Q    That is what I mean.

24        A    Almost all something that happened on the
25    highway.

1          Q    And this case that you're involved in now,

2     do you have a category for that?

3                    MR. BIEDER:  You are talking about

4               the Bernstein case?

5                    MR. GERARDE:  Yes.

6                    THE WITNESS:  I got a file number.

7     BY MR. GERARDE:

8          Q    This wouldn't be -- auto accident

9     reconstruction or bicycle accident reconstruction?

10         A    People are bringing me in to explain

11    engineering things to them.  They are almost all

12    related, accidents.  Lawyers don't care until somebody

13    has an accident.

14         Q    What about product liability, do you get

15    involved in that at all?

16                    MR. BIEDER:  I don't know what you

17              mean by your question.

18    BY MR. GERARDE:

19         Q    In other words, do you analyze allegedly

20    defective products, provide opinions as to whether or

21    not there is a defect?

22         A    I don't think I have ever provided an

23    opinion on those things.  There is one attorney who

24    uses me if he needs an engineer to go out and document

25    stuff, move onto something else.  Like a roller

NIZIANKIEWICZ & MILLER REPORTING SERVICE

1   coaster accident.  Just to document the engineering

2   parts of it.

3           Q   What about fall-down cases?  Do you ever

4   get involved in those, where somebody has fallen off a

5   porch or fallen anywhere and engineers sometimes get

6   involved to reconstruct what the scene looked like or

7   to make measurements, et cetera?

8           A   Yes.  National Grid hired me for one this

9   year.

10                  MR. BIEDER:  What's National Grid?

11                  I am sorry.

12                  THE WITNESS:  A utility

13  company.

14          Before that I am thinking -- there is

15  Niagra or Mohawk will occasionally hire me to go out

16  and measure things.  Some people falling around

17  utility things.  That's been five or six years.  In

18  the late '80s, there was a few.  For the most part, it

19  is highways.

20  BY MR. GERARDE:

21          Q   What about fires?

22          A   No.

23          Q   Construction accidents?

24          A   There was one company once that hired me to

25  look at a wall that tipped over; and to do enough

1    analysis, a simple moment analysis to say, yep, that

2    wall is going to tip over.

3         Q    All right.  So I now understand what you

4    have been telling me for the last five minutes, it is

5    mostly auto type claims.  Occasionally you have

6    bicycle claims?

7         A    There's been some bicycles.  I remember one

8    priest that died when his wheel got stuck in a rut.

9    There's been bicycles that have been struck by

10   automobiles.

11        Q    Give me an idea of how many cases you have

12   been involved in where the condition of a roadway is

13   an important element of your analysis.

14        A    Well, a lot of them, if you are talking

15   about snow and ice.  The Canadian lawyers hire me a

16   lot for that.  The rut that the father got stuck in

17   and died.  The pavement edge, dropoff type questions.

18        Q    Pavement edge dropoffs?

19        A    Yes.  I don't know what percentage.

20             It's seldom, but occasionally it is with

21   ponding on high use state highways with a series of

22   fatalities.  I have been out on that.

23        Q    The ponds cause the fatalities?

24        A    Yes.  You have a section of road with this

25   section of road, in the summer somebody gets killed.

63

1    It is a 400-foot section.  The road either settled or

2    improper construction in the beginning.  It is unusual

3    a road causes the accident, but occasionally that is

4    what we will find.

5        Q    The case involving the priest who rode a

6    bicycle into a rut, which side of that case were you

7    on?

8        A    The priest.

9        Q    And the priest brought suit against a

10   municipality?

11       A    Once you die your estate brings suit is my

12   understanding -- I am an engineer -- against the State

13   of New York.

14       Q    Was your deposition taken in that case?

15       A    No.  There is no deposition for court

16   claims, at least not of the experts.

17       Q    Did you have a trial in this case?

18       A    Yes and no.  The other side didn't get

19   their paperwork in in time.  They had a young lawyer.

20   They just wanted to practice on the engineer.  And

21   they had been told already the judge was not going to

22   rule for them.  We had the trial.  We already knew the

23   result.

24            Is that a trial?  I don't know.

25       Q    Let me say it this way, you testified at

1    that trial?

2         A    Yes.

3         Q    You offered testimony how, in your opinion,

4    the rut was a causative factor of the priest's fall

5    and ultimate death?

6         A    Yes.

7         Q    Are there any other cases, as you put it,

8    where the road caused the accident or the road caused

9    the injury, that you can recall?  That you have been

10   involved in?

11        A    In the last 800 or so cases?

12        Q    Right.

13        A    There have been guide rails that speared

14   people.  There is guide rail that should have been

15   there.  People died on bridge abutments.  There were

16   sharp bends in the road in violation of what was out

17   there.

18             The second night they had it there was a

19   second accident.  It was a truck driver.  That truck

20   driver went off the road.  He was burned and drowned

21   when he hit the river.  There are very few of these

22   where I testified, but there have been a number of

23   them.  It is unusual.

24        Q    Let me try to sharpen it for you, then we

25   can move on.

1        As you know, this is a case where

2   Mr. Bernstein is claiming that a condition of the

3   roadway caused him to fall off his bicycle and suffer

4   the injuries.  And from my prospective, I feel like

5   that case where you were involved on behalf of the

6   priest is a kind of a similar instance because the

7   priest is claiming he hit a rut and that --

8        A    He didn't claim anything.

9        Q    The estate.

10       And is there anything else that comes to

11  mind that is similar to that type of scenario, where

12  either a bicyclist or even a motorist claims that a

13  specific condition of the roadway -- not ice or

14  whatever, but a deterioration of the roadway caused

15  the injury?

16              MR. BIEDER:  Other than the ponding

17         that he said --

18              THE WITNESS:  There is the

19  ponding --

20              MR. BIEDER:  I don't know what you

21         mean, but he can answer.

22              THE WITNESS:  The ponding, by

23  the time we were done with those cases, I done the

24  survey before the case happened.  There is another

25  stretch of pavement out in Amherst, New York, where

1    they had resurfaced the road, left a dropoff on the

2    side.  A person had gone over the dropoff, come back

3    on, lost control, ran into a telephone pole.  They

4    blamed that on the road.  And then with that, right

5    after the trial, a week after the trial, another

6    person did the same thing and died there.

7              I have defended counties where there's been

8    suggestions where there was something wrong with the

9    road.

10        Q    By way of deterioration?

11        A    No.  I have been defending towns and

12   counties, people claiming problems with the original

13   construction.  We are talking about old construction

14   standards and whether or not it was maintained to the

15   original standards.

16             I am not saying there is none that I have

17   done with deterioration.  Out of 800, it's hard to

18   remember what each little case was about.

19        Q    Okay.  In the case of the priest hitting

20   the rut, would that have been a road deterioration

21   issue?

22        A    No.  When they -- it was a ridge of

23   pavement.  One day they reinstalled the rubber gasket

24   in the seam.  They hadn't put the backer board

25   underneath.  They put the wrong gasket in there.

1          Q    Between two slabs of pavement?

2          A    Yes.

3          Q    It created the equivalent of change in

4     elevation?

5          A    No.  A little slat about the width of a

6     bicycle tire.  The bicycle tire sunk in there and the

7     priest was found dead there.

8          Q    Let me focus you on pavement deterioration.

9     By that, what I mean -- what you mentioned about 15

10    minutes ago when we were talking about your DOT

11    experience, when you might have alligator cracking and

12    you might have to make a judgment where we can improve

13    the drainage, save the road -- by saving it or

14    rumblizing it and starting over.  That is what I mean.

15         A    Alligator cracking?

16         Q    Alligator cracking, potholes or rumble

17    pavements.

18                    MR. BIEDER:  Now that you have

19              defined it, what is your question?

20    BY MR. GERARDE:

21         Q    Any assignments as an expert witness that

22    involved a condition of a road similar to that that

23    was being alleged as the causative factor of an

24    injury?

25         A    Not that I remember.

1        Q    Okay.

2        A    That is not to say there isn't one out

3   there someplace, but I can't remember.

4               (At which time the proceedings went off the

5               record.)

6               (After a recess off the record, the

7               following occurred.)

8

9   BY MR. GERARDE:

10       Q    A few more questions on your C.V.

11              On the front page you indicate that you

12  performed a number of consulting engineering services,

13  including, I am reading on the second line of this

14  entry:  "Field surveys, aerial photography,

15  determination of measurements from photographs with

16  computer assistance, determination of coefficient of

17  friction, sight distance, pre-collision speed," et

18  cetera.

19              What I would like to know, of this list of

20  things you do, what have you done in this case?

21                   MR. BIEDER:  Just from that list?

22                   MR. GERARDE:  Yes.

23                   THE WITNESS:  I guess, we

24  have done accident site analysis.  Minor part on the

25  accident reconstruction.  Field surveys.  No aerial

1    some of these highways and the pavement management

2    they taught us in school.

3            With whoever is making these decisions, I

4    don't think they are seeing the big picture.  I think

5    they are looking at the little potholes.  It is more

6    what it doesn't show here.  It doesn't show someone

7    looking at the big picture.  It shows the little

8    potholes.

9        Q    What would you expect to be in that group

10   of documents if someone was looking at the big

11   picture?

12       A    The area that is out there if they are

13   driving over it everyday or every couple of days as

14   they are talking about -- especially the first time I

15   saw it, it was raining, so they have seen it in the

16   rain too.

17           It is fairly obvious there is a drainage

18   problem out there.  Somebody should have been noticing

19   we are dumping sand out here on a regular basis every

20   winter and we are not cleaning up it up that much in

21   the springtime.  We are building bermes on the side of

22   this road.  Something bad is going to happen if we let

23   this continue for years.

24           The berme is not something that appears the

25   first year.  We've got areas where we got these bermes

1  building up.  We should be going through on a regular

2  basis and knocking them down to get back what was

3  there originally.  When this road was originally

4  built, the water drained off the side.

5         Q    The downhill side?

6         A    Right.  And the uphill side, somebody was

7  thinking when they originally built this road they put

8  the pipe underneath so the water would drain

9  underneath the road.  Now the berme is built up, the

10 water can't get to the pipe and the pipe isn't cleaned

11 out on a regular basis anyhow.  It wasn't cleaned out.

12        That is moot because the water can't get to

13 it because they built the berme between the berme and

14 pipe.

15        Q    Give me an area where the pipe is next to

16 it?

17        A    Here (indicating).

18        Q    We are holding a photocopy of two

19 photographs that have been marked Plaintiff's Six and

20 Seven as of the July 17, '03 deposition.  And you are

21 pointing to Exhibit Seven from that deposition?

22        A    Right.

23        Q    It shows a picture of your black Maxima

24 parked on the left edge of the road.  There is a post

25 coming out of the grass shortly before one would reach

1    filled in, there is photographs we can look at.    It

2    was most of the way filled in, so it hadn't been

3    maintained, dug out with material deposited on the

4    road in the wintertime.

5             Second, the water wasn't going to get to it

6    anyhow because there was a berme between the road and

7    entrance to that pipe that kept the water from getting

8    into the pipe.  It had to run on the road.

9        Q    Was the opening to the pipe --

10                MR. BIEDER:  On the --

11   BY MR. GERARDE:

12       Q    On the uphill side, facing uphill or facing

13   the sky, if you know what I mean?

14       A    Facing uphill.  It was a pipe.  It wasn't a

15   drop inlay.

16       Q    So, wouldn't the purpose of that pipe be to

17   catch water coming from the uphill side before it

18   reaches the road?

19       A    There was a ditch on the uphill side of

20   this road running for some distance coming down to

21   this location.  And the ditch would have normally

22   continued into that, but it emptied out onto the road

23   because it was filled in with winter material.

24       Q    So, the purpose of this pipe -- the purpose

25   of this pipe is to not catch water from the surface of

1    documents that is Plaintiff's Exhibit Eight, the

2    impact on your opinions of this group of documents is

3    to show you what the town was doing; and particularly,

4    that the town was not, at least according to what is

5    written here, cleaning out this drainage area?

6         A    What it shows is a lack of training on the

7    part of the town people, yes.

8         Q    It shows lack of training?

9         A    Nobody is looking at the big picture.

10        Q    Why do you attribute that to training?

11        A    Somebody had the training to understand we

12   need to be out there cleaning up the sand.  We are

13   building dams on the side of the roadway.  I would

14   have expected it to be in here.

15        Q    What you're saying is that this condition

16   where the water is allowed to collect at the side of

17   the road is something that would be naturally

18   productive of the asphalt crumbling and the road

19   deteriorating?

20        A    The natural consequence would be what you

21   are talking about; is that what you are talking about?

22        Q    Yes.

23        A    Yes.

24        Q    Now, these two photographs, Plaintiff's

25   Exhibit Six and Seven from the July 17, '03 deposition

1       A    Right.  If the road had been maintained,

2   somebody would have been out there.  They would have

3   been clearing the sides, so the water wouldn't be

4   there.  And when it needed to be resurfaced, it would

5   have been resurfaced.

6       Q    I want to stay with the water before we get

7   to resurfacing and periodic patching.

8                   MR. BIEDER:  Except you're trying to

9               make it as if they are not

10              connected.  I don't want to mislead

11              you.  I don't want you to assume

12              that.

13  BY MR. GERARDE:

14      Q    I want to make sure I understand the issue

15  associated with the water and drainage.

16              Your issue associated with the water is if

17  the water is allowed to collect on the road, it will

18  ultimately deteriorate the road?

19      A    Collect on the road and seep into the

20  sub-base on the road.

21      Q    Six-year capital improvement --

22      A    For many different years.

23      Q    Listed as Exhibit Three?

24                  MR. BIEDER:  A copy of Exhibit Three

25              and a deposition dated --

1    Q    Okay.  Just to stay with our orientation.

2    If we stayed with 1-F, what we are saying, you don't

3    see, as you go to the bottom of the photograph, the

4    holes and patches yet, but it's not too much farther

5    before they come into view?

6    A    Right.

7    Q    And then you write:  "This change happened

8    suddenly and without warning."

9         When you write that, do you mean that the

10   pavement was well-maintained until this area of

11   deterioration was encountered and it essentially went

12   south quickly?

13   A    Yes.  As we can see in Exhibit 1-G, it

14   doesn't look terrible as you are approaching it from

15   less than 200 feet away, but as we see in photograph

16   1-E, which is looking back the other way from less

17   than 200 feet away, or about 200 feet away, the

18   pavement is falling apart.

19        So, it's not like there is a big sign there

20   that says pavement ends or rough pavement or any bump

21   or anything like that.  It is what you can see.  And

22   you really can't see until you are right on top of it.

23   It doesn't show up in the photograph at 200 feet.

24   Q    Okay.  I am going to direct your attention

25   to Exhibit 1-G, to these slight crack lines on the

1    Q    So, this photograph 1-I shows the slight

2    meander to the left?

3    A    Yes.

4    Q    And it is ultimately followed by a meander

5    to the right?

6    A    Afterwards, but a significant distance

7    after.  It is not really critical.

8                    MR. BIEDER:  Can we take a break?

9                    (At which time the proceedings went

10                   off the record.)

11                   (After a recess off the record, the

12                   following occurred.)

13

14   BY MR. GERARDE:

15    Q    All right.  I am on page four.

16   "Conclusions."  You write on the third full sentence

17   of the conclusion:

18                   "It was known by the town that the

19                   roadway was in good repair up to the

20                   accident location.  And the road

21                   surface changed radically where the

22                   accident happened."

23                   What do you base that on?

24    A    The guys are saying they are coming through

25   there a couple of times a week.  One said everyday.

1    correct?

2        A    True.  This location -- once you are on top

3    of it, it is an obvious hazard.  Between their

4    depositions and the totally obvious.

5            I think it is both sides of your answer.

6    Somebody should have known, if they were out there on

7    a regular basis as they said they were.  And the

8    depositions, they said they weren't going to resurface

9    that.  They didn't say it is good, but they said we

10   are not going to make that type of maintenance.

11       Q    I just wanted to know if you'd spoken to

12   someone?

13       A    No, I didn't.

14               MR. BIEDER:  Off the record.

15           (At which time the proceedings went

16           off the record.)

17           (After a discussion off the record,

18           the following occurred.)

19

20

21   BY MR. GERARDE:

22       Q    Where is the photograph that showed on --

23   that would be the continuation of this that shows the

24   actual potholes and old patches and things like that.

25           Can you show me one or more of those,

134

1    BY MR. GERARDE:

2        Q    Let's assume for the purposes of this

3    question that 1E was taken in June of 2002, on your

4    visit.  All right.  What information, if any, do you

5    have that this is what this road, and specifically

6    this area of road that is depicted in the photograph,

7    looked like as of April 14, 2002?

8        A    Well, the critical things we have here.

9    Actually, that photograph is showing the level --

10   photograph 1-E showing the level, showing the grass as

11   being higher than the pavement.  The dirt and the

12   grass is higher than the pavement.

13           So, the grass looks like it's been there

14   for a while.  I can't imagine somebody came out,

15   placed sod along this road.  So it was there in April

16   at the time of the accident.  Probably been there for

17   several years because it hadn't been maintained and

18   taken away.

19       Q    You are talking about the grass?

20       A    The dirt holding the grass up.  It wasn't

21   there because they would have dirt sloping away from

22   the road because of the construction.

23           I didn't have a problem with construction,

24   I had a problem with maintenance.  The gravel, all the

25   potholes out there.  If you have something holding

1   water in a pavement like that, you don't have it

2   change instantly overnight. It is going to happen

3   over a series of years.

4          So, the indication is this is not a new

5   problem. If you damn up a road today, it's not going

6   to fall apart tomorrow.

7          Q   Didn't you tell me earlier that patched

8   roads could fall apart quickly? If, for instance,

9   there was cold patch that was used, that there was

10  still water undermining the road?

11         A   It could fall apart, yes.

12         Q   My point is, this is a June 2002

13  photograph. You can't represent with any degree of

14  probability that those potholes that are seen in this

15  photograph were, in fact, present in April of 2002,

16  can you?

17         A   I wasn't there in April. You will have to

18  ask the people there in April. It's my understanding

19  the road was substantially the same. I was not there

20  in April, obviously.

21         Q   Just looking at this -- that photograph.

22  Just because there is a pothole or broken piece of

23  concrete or gravel on the road in 2002, does not mean

24  the pothole was present in April of 2002; correct?

25         A   It was not an area of good pavement in

1    April of 2002.  If that particular pothole was there

2    or if we have a continuing problem, they patch one

3    pothole and another pops up.  I can't say that is the

4    case.  There is not a whole lot of fresh looking patch

5    out there.

6         Q    And I will ask the same question with

7    respect to the stones and the loose gravel.

8              Simply because there is stone and loose

9    gravel on the road in June 2002, does not mean that

10   stone and gravel was present in April 2002?

11        A    The road has this much water and is falling

12   apart.  Unless somebody goes out there, sweeps just

13   before the accident, there would be stone and gravel

14   out there.

15             Nobody came along and dumped that stone and

16   gravel between April and when I showed up.  It is

17   because the road is falling apart.

18        Q    You don't know --

19        A    -- if that particular piece of gravel was

20   there, I don't know.

21        Q    And given the fact that you still have at

22   least six weeks of spring left as of April 14, 2002,

23   it is likely that rain would occur, significant rain

24   storms and runoff, as you show in your photograph;

25   correct?

1    because I see this area."  He didn't have the warning.

2              What he was doing on the road up until that

3    point was fine.  He didn't have the warning there was

4    a sudden change.

5         Q    Do you consider yourself an expert in

6    bicycle operation?

7         A    Not really more than the highway part.  I

8    could explain some things from an engineering

9    standpoint, but I'm not a bicycle expert.

10        Q    Do you consider yourself an expert on

11   bicycle safety?

12                  MR. BIEDER:  It depends on what you

13                  mean.  So I object to the form of

14                  the question.  Vis-a-vis the

15                  connection with the road is one.  I

16                  don't know where your question -- I

17                  object to the form of the question.

18                  THE WITNESS:  I have done

19   analysis for the town as far as bicycle paths, stuff

20   like that.  As far as operation of bicycles, I don't

21   get into.

22   BY MR. GERARDE:

23        Q    What work have you done for the town with

24   respect to bicycle paths?

25        A    They built some paths in front of my house.

1    I didn't think it was up to standard, so they

2    redesigned it.  I designed a buffer for the street,

3    including a little bit of bicycle paths.

4         Q    You are talking about the Town of Clifton

5    Park?

6         A    Yes.

7         Q    They built a bike path in front of your

8    home?

9         A    Yes.

10        Q    Is it completed now?

11        A    Yes.

12        Q    What materials is it made of?

13        A    Asphalt paving.

14        Q    What about in Buffalo, what was the bike

15   path made of?

16        A    We were doing the alignment.  What would

17   have been called for would have been probably R-type-7

18   high friction asphalt.

19        Q    Have you seen the bike paths that are

20   essentially dirt paths anywhere?

21        A    Yes.

22        Q    Is it your opinion those are unsafe for

23   bicycles?

24        A    It is obviously dirt.  It's not a sudden

25   change.  If you have a bike path paved, then all of a

1   he could have hit, that is different.  But I don't --

2   I haven't seen a consensus.  I am not going to ask you

3   to point to deposition transcripts, because I don't

4   think they are in there, that he hit all four of those

5   things.

6                    MR. BIEDER:  Objection.  Consensus

7                 isn't allowed to come into evidence.

8                    MR. GERARDE:  That is his

9                 testimony.

10                   MR. BIEDER:  You're taking

11                that word and twisting it and that

12                is what you're doing.

13                   THE WITNESS:  My concern is

14  sudden deterioration of the pavement, why it is out

15  there, why there is no economic reason to leave

16  something like that out there.

17       I think, beyond that, I am saying you don't

18  leave rough pavement because it would tend to promote

19  accidents.  I think it is for others to say that the

20  -- we know the bike went down in the area as soon as

21  he hit this pavement.

22       We know he's saying he's braking ahead of

23  time because of this.  Someone is going to have to

24  connect these dots.  I can't say it was this one

25  pothole right there that got the guy.  I would say it

1    is an area that has a maintenance problem.  From an

2    engineering standpoint, here is what caused that area.

3    Here is why it would have been cheaper to take care of

4    that area, to do correct maintenance instead of

5    wasting money on improper maintenance.

6    BY MR. GERARDE:

7         Q    What I am getting at, all experts do this.

8    They make assumptions before they offer opinions

9    because, obviously, you weren't there.

10         What I am trying to define, what is your

11    assumption as to how Mr. Bernstein fell?  In other

12    words, what it was that caused him to fall?

13         A    My assumption is, he hit the area of uneven

14    rough pavement without any prior warning.  And from a

15    engineering standpoint, my big concern is why is that

16    pavement there.

17         Q    And what is that assumption based on?

18                   MR. BIEDER:  Which assumptions?

19                   MR. GERARDE:  That he hit an

20              area of rough pavement in the area

21              we are talking about.

22                   THE WITNESS:  I think between

23    the depositions and me talking to he and his wife.

24    And attorneys talking to him and his wife, they would

25    bring that out in the courtroom.  I would be there to

1       A    Yes.

2       Q    Are you able to testify what the specific

3  condition -- let me ask it this way.

4            Your assumption as to what the specific

5  condition of the roadway was as of April 14, 2002, the

6  day Mr. Bernstein was hurt is based on what you

7  learned from Mr. Bernstein and the other sources you

8  told me about?

9       A    And from being out there and seeing it and

10 from the limited maintenance that was discussed.

11      Q    So, we are clear on that, you weren't out

12 there until June of '02?

13      A    Yes.

14      Q    My question for you is this, what is your

15 understanding as to how long the condition that was in

16 existence on April 14, 2002 was, in fact, in place?

17                  MR. BIEDER:  Objection to the form

18             of the question.  He's testified

19             about a lot of conditions.

20                  MR. GERARDE:  Okay.  Good objection.

21                  MR. BIEDER:  Of course, they are all

22             good.  I don't make them unless they

23             are good.  In all humility.

24 BY MR. GERARDE:

25      Q    Take a look at 1-E.

1          Do you have that in mind?

2     A   Okay.

3     Q   I am under the impression from having asked

4  you questions that you believe that there was a

5  deterioration that existed on the day Stephen

6  Bernstein was hurt that consisted of potholes, ruts

7  gravel, bumps, et cetera.  Is that fair?

8     A   Are we going through the series of

9  questions where we are talking about the exact

10  pothole?  General road condition that has been

11  maintained?  We've got problems.

12     Q   Problems on the road, not a specific

13  pothole, whatever.

14          But you're making an assumption that was a

15  deterioration condition that existed in April of '02?

16     A   Yes.

17     Q   Do you have an assumption as to how long

18  that condition of deterioration existed prior to April

19  of '02?

20     A   Yes.

21     Q   What's that assumption?

22     A   The assumption it's been going on for

23  years.  The grass growing in this mound.  This isn't

24  dirt from last winter.  It's been mounded up for

25  years.  It's not like something somebody scraped up

1   from the year before.  The pavement has multiple thin

2   overlays, patches all over the place.

3            There is different types of overlays,

4   patches.  It's been going on for years.  The dirt

5   berme that used to slope away three-quarter inch per

6   foot.  It's been since dirt roads.  Now it doesn't

7   slope away.

8            There is a dirt berme there.  That wasn't

9   something that happened in a month or two.  It's been

10  allowed to sit there for years.  It is years of lack

11  of maintenance.  Only maintenance being done was going

12  in and filling up these holes instead of taking dirt

13  away.  You don't have to buy anything.  You are paying

14  for asphalt to be put in there that is being thrown

15  out.

16       Q    I am clear as to how unwise it is.

17       A    This is year after year after year.  It

18  didn't happen last week.

19       Q    Let me ask you this.  If a road has a

20  pothole on it and the pothole is patched -- and we are

21  in a time subsequent to the patching, so you have a

22  road with a patched pothole -- is the road reasonably

23  safe at that point?

24            MR. BIEDER:  On that pothole?

25            MR. GERARDE:  Because of that

1           there.  I thought you meant only the

2           deeply gorged holes that seem to be

3           evident.

4    BY MR. GERARDE:

5           Q    Let's talk about the uneven pavement, in

6    some cases, looks like missing overlay?

7           A    Yes.

8           Q    And in other cases it looks like a true

9    pothole that has some depth to it, correct?

10          A    Yes.  And kind of all blend together.

11          Q    So, what I am talking about is any of these

12   deteriorations, whether it is removed overlay or

13   potholes that no longer have patches in them.

14          My question to you is, you cannot rule out

15   that all of these deteriorated areas, whether it is

16   missing overlay or a pothole that are seen in a

17   June 13, 2002 photograph we have marked as

18   Exhibit 1-E, were not patent patches as of April 14,

19   2002, can you?

20          A    I think we can fairly effectively rule that

21   out.  We are looking.  There is different patches from

22   different periods of time.

23          Then what you would suggest -- if you want

24   me to rule out the possibility somebody came and

25   repaved this whole area with pothole patch and it all

1    disappeared without leaving large areas they have done

2    that, I think that can be reasonably ruled out.

3        Q    Obviously, no one came and paved the whole

4    area like we've seen above.

5        A    Basically, you admitted these things are

6    all running together.  If it is all running together,

7    it would be pretty much an overlay is what you are

8    talking about having me rule out.

9        Q    I am not asking you to assume that this

10   repair that we are looking at in photograph 1-E

11   reflects something that was done all at once.  I am

12   asking you to just assume that the roadway you are

13   looking at in 1-E is a series of repairs over time at

14   different times.

15           All right.  At one point one pothole was

16   patched, then another one.  A third area of overlay

17   was patched, so then you had a whole network of

18   patches, basically, adjacent to each other?

19                   MR. BIEDER:  You are asking him to

20                   assume that?

21                   MR. GERARDE:  Yes.

22

23   BY MR. GERARDE:

24       Q    If that was the case, then you can't rule

25   out that that thing I have asked you to assume was

172

1    exactly how it looked in April of 2002, and then all

2    this damage we see in the two months before you took

3    the photograph, can you?

4                    MR. BIEDER:  He already answered

5                that question.

6                    THE WITNESS:  From my

7    engineering experience, I believe that is very, very

8    unlikely.

9    BY MR. GERARDE:

10        Q   Why is that?

11        A   Because as you said these things were all

12   running together.  You would need to have a solid

13   collection of patches through that thing.  We are not

14   coming close to that.  Where did they all go?

15        Q   What is it about any one of these, either

16   potholes or missing overlay, that tells you that's

17   been around for more than two months?

18        A   As we look we see --

19                    MR. BIEDER:  Just only looking at

20                one exhibit, 1-E.

21                    THE WITNESS:  We can see that

22   there is different color patches in there.

23   BY MR. GERARDE:

24        Q   I don't want to talk to you about patches.

25   The patches constitute patent roadway, don't they?

NIZIANKIEWICZ & MILLER REPORTING SERVICE

1              MR. BIEDER:  I will object.  I don't

2          know what you mean by "patent

3          roadway."

4    BY MR. GERARDE:

5         Q   You already told me the road isn't unsafe

6    simply because it's been patched.  I am directing your

7    attention to a pothole or hole or area of broken

8    pavement.

9              MR. BIEDER:  The last question you

10         asked.  Which he was trying to rule

11         out ruling out all those patches

12         disappeared -- excuse me.  Let me

13         finish my objection.

14              If I  misunderstood it, I

15         would like you to ask it again.  You

16         asked him whether he could rule

17         out -- you said, in negative, you

18         can't rule out that all of the

19         things you asked him to assume

20         changed in the two or three months.

21         And he indicated he believes he can

22         rule it out.

23              Now, ask your next question.

24    BY MR. GERARDE:

25         Q   What is it about any one of these

174

1    deteriorated conditions, either a pothole or missing

2    piece of overlay, that as you look at it -- by looking

3    at photograph marked 1-E -- tells you that's been in

4    existence for more than two months?

5         A    The deteriorated overlay there has the

6    alligator crack in it.  The alligator crack is not

7    something that is going to happen in two months.

8    Alligator cracks can't be fixed with cold patching.

9    Cold patch has stones in it.

10        Q    Let me focus you on potholes --

11                  MR. BIEDER:  Define "potholes."

12                  MR. GERARDE:  Potholes would

13             be the deep gauges that --

14                  MR. BIEDER:  The size of a

15             dish plate or bigger?

16                  MR. GERARDE:  No.   That

17             sounds about right.

18    BY MR. GERARDE:

19        Q    The one I will direct your attention to is

20    directly opposite the level in photograph 1-E.

21             Would you call that a pothole?

22        A    Okay.

23        Q    Can you assume that is a pothole?

24                  MR. BIEDER:  As you look to the

25             photograph to the right of the

NIZIANKIEWICZ & MILLER REPORTING SERVICE